UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **MYCO MECHANICAL, INC.**<br>1 N. Washington Street<br>Telford, PA 18969<br><br>　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>**THE HASKELL COMPANY**<br>111 Riverside Avenue<br>Jacksonville, FL 32202<br><br>　　　　　　　　　Defendant. | NO._____ |

## **COMPLAINT**

Plaintiff, Myco Mechanical, Inc. ("Myco") by and through its undersigned counsel, Cohen Seglias Pallas Greenhall & Furman, P.C., hereby files this Complaint against Defendant The Haskell Company ("Haskell"), and in support thereof avers the following:

### **Parties**

1.　Myco is a Pennsylvania corporation having been in business for nearly 30 years providing HVAC, plumbing, and prefabrication services with its principal place of business located at 1 N. Washington Street, Telford, Bucks County, Pennsylvania 18969.

2.　Haskell is a Delaware corporation that performs work as a general contractor with its principal place of business located at 111 Riverside Avenue, Jacksonville, Duval County, Florida 32202.

**Jurisdiction and Venue**

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is a complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

4. This Court has personal jurisdiction over Haskell as Haskell transacts business in Pennsylvania, including in connection with the construction project that forms the subject matter of this lawsuit.

5. Venue is proper in this District because the parties agreed that any litigation be brought in either state or federal court encompassing Bucks County, Pennsylvania.

**Background**

**A.  Myco and Haskell Enter into the Subcontract.**

6. In connection with a construction project known as Mars Project X (the "Project") consisting of an expansion to Mars Wrigley US, LLC's ("Mars") chocolate plant located at 295 Brown Street, Elizabethtown Pennsylvania, Haskell served as the general contractor and designer.

7. In order to complete its scope of work, Haskell entered into a subcontract (the "Subcontract") with Myco dated March 23, 2022, under which Myco was to perform the HVAC and plumbing scope of work on the Project in exchange for $1,352,000.00.

8. The Subcontract included and incorporated Myco's Bid Proposal under which Myco set a time to complete the plumbing scope within 12 months from the start of construction and the HVAC scope within 14 months from the start of construction.

9. Shortly after signing the Subcontract and prior to commencing work on the Project, and more specifically on June 23, 2022, Haskell issued Change Orders 2 and 3 for $317,670.81 and $3,619,000.00, which nearly quadrupled the Subcontract price to $5,288,670.81.

10. Haskell's issuance of Change Orders 2 and 3 to Myco arose out of Mars wanting Myco to order equipment from the specified HVAC equipment manufacturer, Trane USA ("Trane"), which equipment was known to have a long lead-time.

11. By its conduct and approval of Change Orders 2 and 3, Mars effectively single-sourced Trane as the HVAC supplier for the Project.

12. As a result, Haskell, as the general contractor and designer, assumed responsibility for all inherent difficulties associated with the Trane equipment and its use in the space of the Project, including but not limited to delays, compatibility issues, or design constraints.

13. However, it is notable that as of the time that Haskell issued Change Orders 2 and 3, Haskell had not yet completed the Project design, or even the Project scope pertaining to HVAC and plumbing.

14. Despite this lack of completed design, Haskell proceeded under Mars' directive to incorporate the Trane equipment into the Project, further confirming that Trane was single-sourced by the owner and that Haskell bore the corresponding risk associated with integrating such equipment into an incomplete and evolving design.

**B.    Myco Begins Performing and Encounters Delays Attributable to Haskell.**

15. From the outset of the Project, Haskell's Project management was deficient.

16. To that end, the Project was beset with delays, none of which were attributable to Myco or within the control of Myco, but many of which impacted Myco's performance of its work.

17. Those events of delay included cancellation of a crane lift, which delayed Myco's installation of the HVAC unit; conflicting directives on site as between Haskell and the third-party Project consultants; design deficiencies; general Project management shortcomings; and supply chain issues pertaining to the specified HVAC equipment manufacturer, Trane.

18. As these delays were ongoing, Myco provided notification both in writing and verbally in the field that the delays were impacting Myco's ability to timely complete its work for the Subcontract amount.

19. Throughout the Project, however, Haskell sought to deflect blame to Myco for delays arising out of Haskell's own design deficiencies.

20. Notably, on multiple occasions during the Project Haskell issued a Notice to Cure stating a threat to default Myco despite there being no legitimate issues regarding Myco's performance and, instead, coincided with Haskell's expectation for Myco to perform out-of-scope work without a change order.

21. While this was nothing more than a bad faith attempt to exert pressure upon Myco to continue to perform, Myco responded to each Notice to Cure by calling out Haskell's misuse of the default provision of the Subcontract and by identifying that none of the delays on the Project were in any way attributable to Myco, nor were there any deficiencies in Myco's work; instead, the delays and design deficiencies were attributable to Haskell

22. In that regard, following a Notice to Cure dated August 10, 2022, Myco sent a response letter on August 15, 2022 stating in part, "[a]s we have made known on several occasions, the Project has been hampered by delays through no fault of Myco. Myco has done everything within its control to diligently and continuously perform its Work and maintain the schedule, only to be sidetracked and delayed by others on the Project out of Myco's control."

23. As a result of these delays not attributable to Myco, Myco put Haskell on notice that it "reserves any and all rights, claims or demands it has or will have in the future, contractual or otherwise regarding your Notice or, without limitation, any other claim or dispute for delay, damages or an extension of time under the applicable contract documents."

4

24. Myco provided a similar letter in response to a later Notice to Cure dated May 8, 2023.

25. Later, on August 21, 2023, Haskell sent a letter to Myco the subject of which was Notice of Delay, wherein Haskell contended once again that Myco was delaying the Project.

26. More specifically, Haskell took the position that despite requiring Trane air handling units in the Project specifications and despite being aware of the long lead time, the delay in delivery of the air handling units was a delay that Myco caused.

27. However, by requiring Trane as the exclusive HVAC equipment manufacturer, Haskell sole sourced the air handling units and thereby dictated not only the specific equipment to be used, but also critical aspects of how and when that equipment could be procured and installed.

28. In doing so, Haskell usurped Myco's discretion over its means and methods of performance, assuming control over essential elements of Myco's work and imposing conditions outside Myco's control.

29. Of course, Myco disagreed and sent a letter on August 28, 2023 stating as much.

30. In that letter, Myco stated that Haskell's ignorance of well-known facts regarding supply chain issues "in alleging a delay claim can only be considered contrived posturing to shield Haskell from culpability for the delays Myco has suffered and notified it of since August 2022."

31. Given that Haskell sole sourced the Trane equipment and constrained Myco's ability to manage procurement and installation using its own means and methods, responsibility for any delays or compatibility issues stemming from the equipment lies with Haskell, and not Myco.

32. It is an established principle in the construction industry that a subcontractor is typically responsible for the "means and methods" of its work – meaning, the techniques,

sequences and procedures by which the subcontractor achieves compliance with contract specifications.

33. However, when Haskell imposed specific product requirements and mandated the use of a sole-source manufacturer, particularly one with known long lead times and integration complexities, Haskell assumed responsibility for the impact of those decisions on Myco's performance.

34. Accordingly, Haskell's requirement for Myco to use Trane as the sole HVAC equipment manufacturer, without offering alternatives or permitting the use of equivalent products, Haskell deviated from industry norms and imposed conditions inconsistent with Myco's control over its work.

35. Under these circumstances, and consistent with standard construction practices, the risk of resulting delays or performance difficulties shifted to Haskell as the party who directed those constraints.

36. In none of the letters that Haskell sent to Myco did Haskell in any way dispute that Myco had kept Haskell fully apprised of delays impacting its work on the Project.

37. Despite the excessive delays on the Project and Haskell's bad faith threats to default Myco in an effort to get Myco to complete out-of-scope work without a change order, Myco never refused to complete its work on the Project.

38. In fact, Myco did complete all of its work, inclusive of extra work, on the Project, which amount of extra work was significant.

39. To that end, Haskell issued more than 40 separate change orders to Myco during the course of the Project, increasing the Subcontract amount by more than $1 million over and above the adjustments in Change Orders 2 and 3, to a further adjusted amount of $6,496,570.73.

**C.     Haskell Has Failed to Process 14 of Myco's Change Order Requests.**

40.     Separate and apart from Haskell issuing more than 40 change orders, Myco submitted 14 change order requests, or pending change orders ("PCOs") that remain open totaling $234,983.97.

41.     These open PCOs consist of the following:

| PCO # | Submission Date | Description | Amount |
|---|---|---|---|
| 023 | 03/17/2023 | Lost time for work permit | $ 5,168.75 |
| 025 | 03/20/2023 | Hot work permit delay wk 3/13/23 to 3/17/23 | $ 4,390.90 |
| 029 | 06/06/2023 | Remove vent piping | $ 1,829.58 |
| 032 | 07/07/2023 | July 4th OT | $10,998.60 |
| 033 | 07/07/2023 | Existing CHW removal-cap | $ 2,215.88 |
| 045 | 11/03/2023 | Electrical room supply air credit | $ 1,560.00 |
| 046 | 11/13/2023 | OT per Haskell | $51,409.44 |
| 051 | 12/08/2023 | OT per Haskell | $37,422.46 |
| 052 | 12/08/2023 | Duct strapping REV | $25,712.18 |
| 053 | 12/13/2023 | Flushing trace water and CHW generator | $ 6,184.22 |
| 056 | 01/05/2024 | Dec 2023 overtime | $36,635.23 |
| 064 | 03/08/2024 | Feb 2024 overtime | $21,690.00 |
| 066 | 04/04/2024 | 2024 Avetta costs | $ 1,180.45 |
| 068 | 05/24/2024 | Jan OT | $28,586.28 |

42.     The open PCOs consist of overtime work that Myco performed at Haskell's express direction, lost time for delays in Haskell obtaining necessary permits, and changes in Myco's scope of work that Haskell initiated.

43.     While the bulk of these PCOs have been pending for well over a year (and some, for close to two years) and despite never rejecting the PCOs, Haskell has inexplicably failed to execute change orders and make payment to Myco for this extra work.

44.     Indeed, at no point has Haskell contested the legitimacy of the PCOs; rather, it impliedly accepted the PCOs through its conduct.

7

**D.     Myco Completes its Scope of Work and Haskell Refuses to Make Payment.**

45.     Myco finally completed its work on the Project as of February 2024, having incurred general conditions costs for six months longer than anticipated at the time of bid.

46.     Accordingly, on March 31, 2024, Myco submitted Invoice #24 to Haskell for the release of retainage totaling 10% of the Subcontract amount as of that date, or $644,306.95.

47.     It was common during the Project for Haskell to take up to 90 days to make payment to Myco.

48.     As such, when Haskell had been in possession of Invoice #24 for longer than 90 days, Myco began to inquire about the status of payment of Invoice #24 as well as the outstanding PCOs.

49.     In response to Myco's inquiries, beginning in August 2024 – nearly six months after Myco completed its work on the Project – Haskell began to contend, without any support, that certain portions of Myco's work were defective.

50.     That Haskell had no support for such contentions is not surprising.

51.     Specifically, all of the issues that Haskell raised pertained to the functioning of the Trane equipment.

52.     Of course, Haskell engineered and designed the Project, specifying Trane as the basis of design equipment manufacturer.

53.     As Haskell sole sourced Trane as the exclusive HVAC equipment manufacturer and required Myco to procure and install that specific equipment, without affording Myco discretion to select an alternative or to modify the equipment or its specification, Haskell assumed responsibility for the performance, compatibility, and functionality of the equipment.

54. Under well-recognized construction industry standards and contract principles, when a general contractor dictates the exact source and model of specialized equipment, it likewise assumes the risk of that equipment's adequacy and performance.

55. Any deficiencies identified by Haskell are not attributable to Myco's workmanship or installation but, instead, arise from inherent limitations or defects in the sole-sourced Trane equipment.

56. Myco performed its scope of work in accordance with Haskell's direction, the approved plans and specifications, and consistent with industry standards, and Haskell cannot now shift blame for performance issues tied to its own equipment selections.

57. Accordingly, any alleged defects, operational issues, or delays that Haskell may now raise are not the result of Myco's installation, but stem from the Trane equipment that Haskell mandated through Change Orders 2 and 3, and the Project specifications.

58. To the extent that Haskell asserts complaints related to the HVAC system, it is asserting complaints against conditions it created, and for which it bears full responsibility.

59. Moreover, should Haskell believe it has factual support for its complaints related to the HVAC system, such complaints, if valid, lie with the manufacturer Haskell chose to sole source, and not with Myco, whose responsibility ended with proper installation.

60. Notably, Haskell has never identified any improper installation by Myco that resulted in the problems it allegedly experienced.

61. Nevertheless, Haskell has attempted to use its unfounded allegations of defective work as a setoff against amounts due and owing to Myco, having gone so far as to expressly condition payment of any amount on Myco signing a deductive change order for $263,791.90.

9

62. In response to Haskell's inappropriate attempt to condition payment on Myco signing a deductive change order, on September 26, 2024, Myco's Director of Field Operations, Tom Krieger, notified Haskell's Director of Construction, William E. Schaet, that Haskell's actions in withholding payment were in violation of the Pennsylvania Contractor and Subcontractor Payment Act and reiterating that Myco's work was not in any way defective.

63. In that same email, Mr. Krieger stated that "Myco expects payment in full (both the contractual amount as well as the change orders previously discussed) by close of business October 3rd or Myco will proceed with litigation without further notice to you."

64. Notwithstanding Myco's stated expectation with regard to payment, Haskell did not make payment by the close of business on October 3, 2024, or at any time thereafter.

65. Worse, Haskell did not pay the undisputed portion of Invoice #24.

66. That is, after considering Haskell's unilateral view that it is entitled to a setoff for $263,791.90 with which Myco disagrees, the balance of Invoice #24 totaling $380,515.05 is not in dispute.

67. Haskell's failure is all the more remarkable inasmuch as it is undisputed that the Project is complete, Mars now has beneficial use of the Project and, upon Myco's information and belief, Mars has made payment to Haskell in full on account of Myco's work on the Project.

68. On November 14, 2024, Myco, through its undersigned counsel, sent Haskell a letter reiterating Myco's demand for payment and that conditioning payment upon execution of a deductive change order violated Pennsylvania law.

69. Presumably in response, on November 26, 2024, Haskell sent to Myco a Retainage Voucher pursuant to which Haskell would release $325,725.25 in retainage due and owing to Myco in exchange for Myco providing a Final Waiver and Lien Release.

70. Because Myco was not agreeable to conditioning payment of a portion of retainage on the execution of a final release, Myco did not return the Retainage Voucher.

71. Accordingly, all amounts due and owing to Myco in terms of retainage, the PCOs, and extended general conditions costs presently remain outstanding.

## COUNT I
## Breach of Contract

72. Myco hereby incorporates the preceding paragraphs as if fully set forth herein.

73. Myco and Haskell entered into the Subcontract, which is a valid and enforceable contract.

74. Under the terms of the Subcontract, Haskell agreed to perform the HVAC and plumbing scope of work on the Project and Haskell agreed to make payment for Myco's performance of that work, including for all extra work.

75. Myco performed its work under the Subcontract, inclusive of all extra work, in a good and workmanlike manner that conformed to the requirements of the Subcontract.

76. Haskell failed to abide by the requirements of the Subcontract and, in doing so, Haskell materially breached the Subcontract.

77. More specifically, Haskell failed to make payment to Myco in full even though Myco has met all conditions under the Subcontract with respect to payment.

78. As a direct and proximate cause of Haskell's material breach of the Subcontract, Myco has suffered damages in excess of $1,600,000, inclusive of $644,306.95 in retainage, $234,983.57 in open change order requests, and an amount to be more fully determined on account of delay but in excess of $750,000.

**WHEREFORE**, Plaintiff Myco Mechanical, Inc., demands judgment in its favor and against Defendant The Haskell Company as to Count I of its Complaint in an amount in excess of $1,600,000 plus interest, costs, and such other relief as may be just and proper.

## COUNT II
### Unjust Enrichment
### (In the Alternative to Counts I, III, and IV)

79. Myco hereby incorporates the preceding paragraphs as if fully set forth herein.

80. Myco provided and supplied labor and services to the Project for Haskell's benefit fully expecting compensation for the same.

81. Haskell had an objective expectation to pay Myco for the labor and services supplied.

82. Haskell enjoyed the benefit of the labor and services Myco provided to the Project.

83. Haskell's retention of the benefit of the labor and services Myco provided to the Project without fully compensating Myco would be unjust.

84. Haskell has been unjustly enriched in an amount in excess of $1,600,000.

**WHEREFORE**, Plaintiff Myco Mechanical, Inc., demands judgment in its favor and against Defendant The Haskell Company as to Count II of its Complaint in an amount in excess of $1,600,000 plus interest, costs, and such other relief as may be just and proper.

## COUNT III
### *Quantum Meruit*
### (In the Alternative to Counts I, II, and IV)

85. Myco hereby incorporates the preceding paragraphs as if fully set forth herein.

86. Myco supplied labor and services to the Project in good faith for Haskell's benefit and at the express request and direction of Haskell, fully expecting to be compensated for the same.

87. Haskell received and accepted the benefit and use of the labor and services provided by Myco to the Project.

88. Myco is entitled to the value of the labor and services it provided to the Project, all of which it performed in a competent and workmanlike manner and all of which Haskell requested, received, and accepted.

89. The reasonable *quantum meruit* value of the labor and services Myco provided to the Project for which Haskell has failed and refused to pay is in excess of $1,600,000.

**WHEREFORE**, Plaintiff Myco Mechanical, Inc., demands judgment in its favor and against Defendant The Haskell Company as to Count III of its Complaint in an amount in excess of $1,600,000 plus interest, costs, and such other relief as may be just and proper.

### COUNT IV
### Promissory Estoppel
### (In the Alternative to Counts I, II, and III)

90. Myco hereby incorporates the preceding paragraphs as if fully set forth herein.

91. Haskell promised to pay Myco for the labor and services supplied to it, fully expecting Myco would rely on that promise when Myco decided to perform the work requested by Haskell.

92. Myco did, in fact, rely upon Haskell's promise in its decision to supply labor and services to Haskell.

93. Myco's reliance on Haskell's promise was both reasonable and foreseeable.

94. Myco has been injured due to Haskell's failure and refusal to adhere to its promise.

95. It would be unjust not to enforce Haskell's promise to pay and injustice can only be avoided by enforcing Haskell's promise to pay Myco for the value of labor and services which remain unpaid in an amount in excess of $1,600,000.

**WHEREFORE**, Plaintiff Myco Mechanical, Inc., demands judgment in its favor and against Defendant The Haskell Company as to Count IV of its Complaint in an amount in excess of $1,600,000 plus interest, costs, and such other relief as may be just and proper.

## COUNT V
### Violation of Contractor and Subcontractor Payment Act

96. Myco hereby incorporates the preceding paragraphs as if fully set forth herein.

97. Myco provided labor, materials, equipment, and services for a construction project located in the Commonwealth of Pennsylvania.

98. Accordingly, the Pennsylvania Contractor and Subcontractor Payment Act ("CASPA"), 73 P.S. §§ 501 *et seq.*, is applicable to the Subcontract and the labor, materials, equipment, and services provided by Myco to Haskell.

99. Haskell is a "Contractor" as defined by CASPA.

100. Myco is a "Subcontractor" as defined by CASPA.

101. Myco performed its work on the Project in accordance with the terms of the Subcontract and, therefore, is entitled to payment pursuant to the Subcontract and CASPA.

102. Haskell failed to pay Myco timely and pursuant to the requirements of the Subcontract and CASPA.

103. Haskell has wrongfully withheld, and continues to wrongfully withhold, payment from Myco in violation of the Subcontract and CASPA.

104. Haskell did not provide any written notice of deficiency items to Myco, nor a written explanation of its good faith reason for withholding payment, in accordance with the time and manner prescribed by CASPA.

105. Conversely, Haskell has acted in bad faith by engaging in wrongful, coercive tactics conditioning undisputed payment amounts upon Myco providing a final release.

106. Haskell has no justification for failing to timely pay Myco pursuant to the Subcontract and CASPA.

107. Accordingly, Myco is entitled to recover from Haskell all amounts wrongfully withheld, as well as statutory interest, penalties, and attorneys' fees and costs as provided under CASPA.

**WHEREFORE**, Plaintiff Myco Mechanical, Inc., demands judgment in its favor and against Defendant The Haskell Company as to Count IV of its Complaint in an amount in excess of $1,600,000 plus interest, penalty, attorneys' fees and costs, and such other relief as may be just and proper.

**COHEN SEGLIAS PALLAS GREENHALL & FURMAN, P.C.**

By: _/s/ Shawn R. Farrell_

**SHAWN R. FARRELL**
**MATTHEW L. ERLANGER**
1600 Market Street, 32nd Fl.
Philadelphia, PA 19103
(215) 564-1700
sfarrell@cohenseglias.com
merlanger@cohenseglias.com
*Attorneys for Plaintiff Myco Mechanical, Inc.*

Date:   April 24, 2025

9861541.1 54052-0031